UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVID MYLES,
*Plaintiff*,

v.

No. 3:19-cv-00639 (JAM)

ANGEL QUIROS *et al.*,
*Defendants*.

**ORDER DISMISSING COMPLAINT PURSUANT TO 28 U.S.C. § 1915A**

David Myles is a prisoner in the custody of the Connecticut Department of Correction ("DOC"). He has filed a complaint *pro se* and *in forma pauperis* under 42 U.S.C. § 1983 against several DOC officials stemming from an incident in which he was disciplined because of his failure to furnish a urine sample. For the reasons stated below, I will dismiss Myles's complaint without prejudice.

BACKGROUND

Myles was a prisoner at the Carl Robinson Correctional Institution when the relevant events as alleged in his complaint took place. He has named the following defendants in their individual and official capacities: Warden Murphy; Captain Rios; Lieutenants Martinez, Sheehan, and Perez; Officers Kirchmier, Betances, and Andrews; mental health clinician Kelly; Angel Quiros; and a defendant identified only as Burgmyer. Doc. #1 at 2-3.

The following facts are alleged in the complaint and are accepted as true only for purposes of this ruling. On October 26, 2017, at approximately 8:50 a.m., another inmate woke Myles up because correctional officials had called for him. Doc. #1 at 4 (¶ 1). Myles stood up and went to the "bubble," where he was instructed to get dressed because he had to leave the unit. *Id.* (¶ 2). Myles asked the officer in the bubble where he was going, but the officer just told

him that he would find out when he dressed and returned. *Ibid.* Myles then used the bathroom in his cell, washed up, dressed himself, and returned to the bubble. *Ibid.* (¶ 3). The officer in the bubble then instructed him to go to the operations unit. *Ibid.* (¶ 4).

When he arrived at the operations unit, Officer Kirchmeir told him that he had to give a urine sample for drug testing because he was scheduled to go to a halfway house. *Ibid.* (¶ 5). Myles told Kirchmeir that he had just urinated and would need some water to urinate again, but Kirchmeir denied his request for water. *Ibid.* (¶¶ 6-7). Kirchmeir said that, if Myles did not provide a urine sample within three hours, he would not be released from the facility and he would be placed in segregation with a disciplinary report. *Ibid.* (¶ 7). Myles said that he was clean and that he just needed water to produce more urine. *Ibid.* (¶ 8). Kirchmeir told him that DOC regulations prohibited him from having water to help him urinate, despite the fact that he had just urinated. *Id.* at 4-5 (¶ 9). Myles asked Kirchmeir to show him the rule to which he was referring and to call a lieutenant supervisor. *Id.* at 5 (¶ 10). Kirchmeir told Myles to wait for the lieutenant who was touring the unit, but he could not find the DOC rule prohibiting water. *Ibid.* (¶ 11). Myles offered to provide a buccal swab, hair sample, or blood sample to show that he did not have drugs in his system, but Kirchmeir said that the testing must be done with urine. *Ibid.* (¶ 12). Myles pleaded with Kirchmeir for one cup of water, but Kirchmeir insisted that water was not permitted. *Ibid.* (¶ 13).

While waiting for the lieutenant to arrive, Myles entered the restroom two different times under Kirchmeir's supervision to attempt to give a urine sample, but he was unable to do so. *Ibid.* (¶ 14). During that time, Officer Betances arrived at the unit, and Myles explained to him the situation. *Ibid.* (¶ 15). Betances refused to give Myles any water, also saying that it was prohibited by DOC regulations. *Ibid.* (¶ 16). Myles asked Betances to show him the rule, and

Betances could not locate the specific rule. *Ibid.* (¶¶ 17-18). Nevertheless, Betances still denied him the opportunity to drink water. *Ibid.* (¶ 18). Myles made a third attempt to urinate but was unsuccessful. *Id.* at 6 (¶ 20).

Shortly thereafter, Lieutenant Martinez arrived, and Myles explained the situation to her regarding his inability to urinate. *Ibid.* (¶ 21). Like Kirchmeir and Betances, Martinez denied Myles any water, stating that it was prohibited by DOC regulations. *Ibid.* (¶ 23). She also denied Myles the opportunity to provide hair, blood, or saliva samples. *Ibid.* (¶ 25). After looking at the regulations, Martinez later agreed with Myles that there was no such rule prohibiting inmates from drinking water prior to giving a urine sample, but she still refused, claiming that it was "under their own discretion." *Ibid.* (¶ 26). Martinez then told Myles that, if he did not "squeeze something out soon," then he "must like jail" and "must not want to go home." *Ibid.* (¶ 27). Myles made a fourth attempt to urinate but was unable to do so. *Ibid.* (¶ 28).

At this point, Myles was halfway through his three-hour allotted time frame. *Ibid.* (¶ 29). He spotted Captain Rios in the area, called her over, and explained to her the situation. *Ibid.* (¶¶ 29-30). Rios looked for the rule referenced by Kirchmeir and Betances but agreed with Martinez and Myles that no such rule existed. *Ibid.* (¶ 31). Rios said that she was sorry, but because the other officials had already made their decision, she was not going to permit Myles to have any water. *Ibid.* (¶ 32). Myles tried two more times to urinate before his three-hour time limit expired, but he continued to be unable to do so. *Id.* at 6-7 (¶ 33).

After the time expired, Lieutenant Sheehan called Myles to his office and asked him why he did not provide a urine sample. *Id.* at 7 (¶ 34). Myles explained the entire situation to Sheehan, but Sheehan told him that "he [did not] give a shit," that "it [was not] his problem," and that because Myles did not urinate he was going to segregation. *Ibid.* (¶ 35). Myles pleaded with

3

Sheehan, but Sheehan responded, "[I]f you would have just peed, you would be on your way to a halfway house and I wouldn't have to do paperwork, but since you didn't, you're going to seg." *Ibid.* (¶ 36). Myles then sat and waited for Sheehan and Officer Andrews to handcuff him and escort him to segregation. *Ibid.* (¶ 37). While waiting, correctional staff made comments such as "he can't get it up," "he couldn't perform," and "he must love jail." *Ibid.* (¶ 38). A short time later, Myles was strip searched and placed in a restrictive housing unit ("RHU"). *Ibid.* (¶ 39).

While in RHU, Myles became deeply stressed and spoke with Mental Health Clinician Kelly about the situation. *Ibid.* (¶ 40). Kelly, however, was very rude to Myles, telling him that he "fucked up," that "he did this to [him]self," and that if he continued "being emotional about th[e] situation, she [would] put [him] in a turtle suit" and keep him in segregation for longer. *Ibid.*

A couple of days later, Myles attended his disciplinary hearing and explained the circumstances surrounding his drug test. *Ibid.* (¶ 41). Officials nevertheless found him guilty for refusing to submit to drug testing even though he had made six attempts to urinate. *Ibid.* As a result, Myles was sanctioned with seven days in RHU and fifteen days loss of good time credits. *Id.* at 7-8 (¶ 42). Betances later told him that he felt bad about the situation because it was wrong for officials to deny him water. *Ibid.* (¶ 42).

After seven days in RHU, Myles provided a clean urine sample and was placed back into general population. *Id.* at 8 (¶¶ 43-44). He filed written grievances and appealed the disciplinary finding to Warden Murphy and District Administrator Quiros, but "[n]othing changed." *Ibid.* (¶ 45). Because of the adverse disciplinary finding, Myles was forced to stay in prison until March 13, 2018, when he otherwise could have been sent to a halfway house on October 27, 2017. *Ibid.* (¶ 45). The situation also caused him to experience emotional distress and suicidal thoughts. *Ibid.*

(¶ 46). When he was finally released from prison, Myles sought mental health treatment. *Ibid.* (¶ 47). He was officially diagnosed with Post-Traumatic Stress Disorder ("PTSD") on March 22, 2018. *Ibid.*

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A, the Court must review a prisoner's civil complaint against a governmental entity or governmental actors and "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint—(1) is frivolous, malicious, or fails to state a claim upon which relief may be granted; or (2) seeks monetary relief from a defendant who is immune from such relief." If the prisoner is proceeding *pro se*, the allegations of the complaint must be read liberally to raise the strongest arguments that they suggest. *See Tracy v. Freshwater*, 623 F.3d 90, 101-02 (2d Cir. 2010).

In recent years, the Supreme Court has set forth a threshold "plausibility" pleading standard for courts to evaluate the adequacy of allegations in federal court complaints. A complaint must allege enough facts—as distinct from legal conclusions—that give rise to plausible grounds for relief. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Notwithstanding the rule of liberal interpretation of a *pro se* complaint, a *pro se* complaint may not survive dismissal if its factual allegations do not meet the basic plausibility standard. *See, e.g.*, *Fowlkes v. Ironworkers Local 40*, 790 F.3d 378, 387 (2d Cir. 2015).

Moreover, because the Court's obligation to conduct an initial review requires consideration of whether any defendant may be immune from relief, see 28 U.S.C. § 1915A(b)(2), the Court may appropriately consider qualified immunity at the initial review stage. *See Story v. Foote*, 782 F.3d 968, 969-70 (8th Cir. 2015). Accordingly, as to any claim for

money damages against a prison official in the official's individual capacity, the Court must consider whether the complaint alleges facts to show a violation of clearly established law such that any objectively reasonable prison official would have known that he was violating the plaintiff's constitutional rights. *See, e.g.*, *Mara v. Rilling*, 921 F.3d 48, 68-69 (2d Cir. 2019).

Myles claims that defendants' refusal to give him water so that he could urinate for his drug test, as well as the subsequent disciplinary action and the associated loss of good time credit and stay in prison rather than a halfway house violated his right against cruel and unusual punishment under the Eighth Amendment, his Fourteenth Amendment right to equal protection of the laws, and his Fourteenth Amendment right to due process. *See* Doc. #1 at 8 (¶ 48). For the reasons I explain in this ruling, I will dismiss each of his claims.

### *Sovereign immunity*

As a preliminary matter, I will dismiss the claims against all defendants insofar as he sues them for damages in their official capacities. The Eleventh Amendment prevents Myles from maintaining a suit for money damages against state employees in their official capacities, *see, e.g.*, *Kentucky v. Graham*, 473 U.S. 159, 169 (1985)—and so because all defendants work for the DOC, they are immune from a damages suit in their official capacities.

I will also dismiss all claims against defendants for injunctive relief. A request for injunctive relief from a state agency or official is not cognizable consistent with the Eleventh Amendment absent an allegation of an ongoing constitutional violation. *See Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 254 (2011) (citing *Ex parte Young*, 209 U.S. 123 (1908)), and Myles has sued defendants based on events that took place to him only in late 2017 and early 2018. Moreover, "[i]n this circuit, an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v.*

*Goord*, 467 F.3d 263, 272 (2d Cir. 2006). All defendants are officials of Carl Robinson Correctional Institution, *see* Doc. #1 at 2-3, while Myles is currently incarcerated at Willard-Cybulski Correctional Institution, *see id.* at 2, and I will therefore also dismiss Myles's claims for injunctive relief as moot. So, because Myles can neither sue defendants for prospective relief, nor sue defendants in their official capacities for damages, I will only evaluate his claims against defendants in their individual capacities for damages.

### *Eighth Amendment*

The Eighth Amendment to the U.S. Constitution protects against the infliction of cruel and unusual punishment. U.S. Const. amend. VIII. In order to state an Eighth Amendment claim, a prisoner must generally show that a defendant acted maliciously or recklessly and that the consequence was sufficiently serious to reach constitutional dimensions. *See Farmer v. Brennan,* 511 U.S. 825, 834 (1994); *Crawford v. Cuomo*, 796 F.3d 252, 256 (2d Cir. 2015); *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012).

When prison officials act for reasons that are reasonably related to legitimate penological interests, then they have not violated an inmate's rights under the Eighth Amendment. *See Turner v. Safley,* 482 U.S. 78, 89 (1987). "Subjecting the day-to-day judgments of prison officials to an inflexible strict scrutiny analysis would seriously hamper their ability to anticipate security problems and to adopt innovative solutions to the intractable problems of prison administration," and strict scrutiny review "would also distort the decisionmaking process, for every administrative judgment would be subject to the possibility that some court somewhere would conclude that it had a less restrictive way of solving the problem at hand." *Ibid.*

Prison officials plainly have a legitimate penological interest in ensuring that inmates do not use illicit drugs and in conducting appropriate drug testing of inmates. "Prison officials are

7

not required to have probable cause, or even individualized suspicion to conduct a drug test on an inmate." *Bates v. Davis*, 116 F. App'x 756, 758 (7th Cir. 2004) (internal citations omitted).

Moreover, the Court takes judicial notice of the Connecticut Department of Correction's regulations that specify procedures for conducting random urinalysis testing. *See* DOC Administrative Directive 6.8 (Urinalysis) (effective date Aug. 26, 2015).[1] The regulation provides in relevant part that inmates are subject to random urinalysis testing. *Id.* at 2 (¶ 5). The regulation further provides that an inmate is subject to discipline if he refuses to submit a urine specimen as ordered and that "[a]n inmate who claims to be unable to provide a urine specimen immediately shall be detained until able to do so" and that "[a]n inmate who claims inability to provide a urine specimen three (3) hours after being ordered to do so shall be considered to be refusing to submit the specimen." *Id.* at 3 (¶ 9). The regulations do not state whether a prisoner who refuses to furnish a specimen must be given access to water or other means to facilitate his furnishing of a specimen.

Because Myles cannot contest that prison officials had a legitimate reason to require him to submit a urine specimen and that prison officials were authorized to impose discipline for his failure to render a specimen, his only claim appears to be that it violated the Eighth Amendment for prison officials not to allow him to drink water after he claimed that he could not produce a urine specimen. Research does not reveal any precedent suggesting that a prisoner has a constitutional right to a drink of water for purposes of producing a requested urine specimen. *See Robles v. Bleau*, 2008 WL 4693153, at *10 (N.D.N.Y. 2008) (no constitutional right to discretionary grant of water during urine testing); *cf. Varughese v. Mount Sinai Med. Ctr.*, 2015 WL 1499618, at *17 (S.D.N.Y. 2015) ("the Court is familiar with this gambit from criminal

---

[1] The DOC's administrative directives are available at https://portal.ct.gov/DOC/Common-Elements/Common-Elements/Directives-and-Polices-Links (last accessed July 18, 2019).

cases, where drug users use water to dilute evidence of drugs in their urine"), *aff'd*, 693 F. App'x 41 (2d Cir. 2017). Nor did it violate the Eighth Amendment if officers ridiculed Myles for his failure to produce a sample. *See, e.g.*, *May v. Trancoso*, 412 F. App'x 899, 904 (7th Cir. 2011) ((("Officer Goken's brief verbal ridicule of May as he provided the [urine] sample in private does not amount to cruel and unusual punishment.").

Accordingly, for lack of any clearly established law that would have put an objectively reasonable prison official on notice that he or she was violating Myles's constitutional rights by not allowing him to drink water in order to render a urine specimen, I conclude that Myles may not maintain his Eighth Amendment claim against any of the defendants with respect to the urinalysis procedures as described in the complaint.

### *Fourteenth Amendment equal protection*

Myles claims a violation of his right to equal protection of the law. The Fourteenth Amendment to the U.S. Constitution provides that a State shall not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend. XIV, § 1. The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). If a governmental distinction targets a suspect class (such as a class of persons based on race, gender, or religion) or targets the exercise of a fundamental right (such as the right to vote), then that governmental classification will be subject to heightened or strict scrutiny; all other governmental classifications need only be supported by a rational basis. *See Winston v. City of Syracuse*, 887 F.3d 553, 560 (2d Cir. 2018). Moreover, a claim for violation of the Equal Protection Clause requires more than proof of unequal treatment or disparate impact; a plaintiff must plead and prove no less than intentional or purposeful discrimination as compared to otherwise similarly

9

situated persons. *See Burgis v. N.Y.C. Dep't of Sanitation*, 798 F.3d 63, 68-69 (2d Cir. 2015); *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005).

Myles has not alleged sufficient facts to sustain a plausible Equal Protection claim. He does not allege any facts to suggest that the denial of water when he was attempting to take a urine test, subsequent disciplinary proceeding, time in restrictive housing, or delay in reaching a halfway house were the product of any intentional or purposeful discrimination by any of the defendants against him as compared to any similarly situated comparator. Accordingly, I will dismiss any claim under the Equal Protection Clause.

### *Fourteenth Amendment due process*

The Fourteenth Amendment provides that a State shall not "deprive any person life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The standard analysis for a procedural due process claim "proceeds in two steps: [A court] first ask[s] whether there exists a liberty or property interest of which a person has been deprived, and if so . . . whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

I will start with whether Myles was deprived of a liberty interest. In the prison context, which involves someone whose liberty interests have already been severely restricted because of his confinement in a prison, a prisoner plaintiff must show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). Following *Sandin*, the Second Circuit has explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Davis v. Barrett*, 576 F.3d 129, 133-34 (2d Cir. 2009) (*per curiam*); *Palmer v.*

10

*Richards*, 364 F.3d 60, 64 (2d Cir. 2004). Typically, restrictive confinements of less than 101 days do not implicate a liberty interest. *See Davis*, 576 F.3d at 133.

Viewing the facts in the light most favorable to Myles, he has largely failed to allege the deprivation of a protected liberty interest. Myles alleges that he spent "[a] couple of days" in segregation before his disciplinary hearing, Doc. #1 at 7 (¶ 41), and seven days in segregation afterwards, *id.* at 7-8 (¶¶ 42-44), a time period well below the 101-day threshold that would normally implicate a liberty interest.

Myles also cannot claim that defendants violated his rights by filing what he considers to be a false disciplinary report, *see Stockwell v. Santiago*, 2016 WL 7197362, at *4 (D. Conn. 2016), nor can Myles succeed in claiming that his release to a halfway house was delayed. There is no constitutionally protected right to be released on parole, let alone to receive simply a step down in the restrictiveness in incarceration a halfway house provides. *See Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7-8 (1979). Similarly, Connecticut state law does not create a protected liberty interest in parole for Connecticut inmates. *See Lichtenthal v. Cortese*, 2007 WL 2049544, at *1 (D. Conn. 2007).

It is true, however, that prisoners enjoy a liberty interest in earned good time credit. *See Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citing *Wolff v. McDonnell*, 418 U.S. 539, 555-56 (1974)). But even assuming that Myles may appropriately challenge the deprivation of good time credit under § 1983 in this case, he still has failed to allege any procedural deficiencies in its denial.

A plaintiff who shows a deprivation of a liberty interest must then show that he did not receive the process that was constitutionally due. The procedural protections that are due to a prison inmate facing a disciplinary hearing are not the same as the due process protections for a

11

criminal defendant standing trial. *See Wolff*, 418 U.S. at 556; *Sira*, 380 F.3d at 69. Thus, for example, a prison inmate does not have the right to counsel or to confront witnesses against him. *See Sira*, 380 F.3d at 69 (citing *Wolff*, 418 U.S. at 567-70). On the other hand, an inmate must be given "advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken." *Ibid.* (citing *Wolff*, 418 U.S. at 563-70). Moreover, there must be at least some evidence to support the findings made in the disciplinary hearing. *See Washington v. Gonyea*, 538 F. App'x 23, 25 (2d Cir. 2013).

In this case, Myles only conclusorily alleges that he was found guilty for refusing to produce a urine sample despite his attempts to do so; he does not actually allege that he was deprived of any of *Wolff*'s and *Sira*'s procedural protections. *See* Doc. #1 at 7 (¶ 41). Accordingly, even to the extent Myles alleges he was deprived of a liberty interest, he has not stated a plausible claim that this occurred absent the process he was due, so I will dismiss his procedural due process claim.

Insofar as Myles attempts to show a violation of substantive due process under the Fourteenth Amendment, his claim still fails. In order to state a substantive due process claim, a plaintiff must allege that government officials have deprived him of a fundamental constitutional right and that they have done so under circumstances that are no less than "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 590 (2d Cir. 2014) (substantive due process has generally protected "matters relating to marriage, family, procreation, and the right to bodily integrity"); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262-63 (2d Cir. 1999) (substantive due

12

process standards violated "only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Velez v. Levy*, 401 F.3d 75, 93-94 (2d Cir. 2005) (describing the "shocks the conscience" standard).

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that amendment, not the more generalized notion of substantive due process, must be the guide or analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). To the extent that Myles has attempted to allege generally that his conditions of confinement were inadequate, that he was singled out for unfair treatment, or that he did not receive adequate procedural protections at his disciplinary hearing, such claims sound in the Eighth Amendment, Equal Protection Clause, and procedural due process as I have discussed above.

At best, Myles may be attempting to claim that defendants violated his substantive due process rights in that their actions denying him water set him up to be disciplined and delayed in being sent to a halfway house. Such a claim would still, however, be barred by qualified immunity. The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982); *see also Carroll v. Carman*, 135 S. Ct. 348, 350 (2014). Qualified immunity protects a government official from liability if "(1) his conduct [did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known, or (2) it was objectively reasonable for him to believe that his actions were lawful at the time of the

13

challenged act." *Simpson v. City of New York*, 793 F.3d 259, 268 (2d Cir. 2015); *see also Amore v. Novarro*, 624 F.3d 522, 529-30 (2d Cir. 2010).

The Second Circuit has noted that "[t]o determine whether the relevant law was clearly established, we consider the specificity with which a right is defined, the existence of Supreme Court or Court of Appeals case law on the subject, and the understanding of a reasonable officer in light of preexisting law." *Terebesi v. Torreso*, 764 F.3d 217, 231 (2d Cir. 2014). The law may be clearly established if "decisions from this or other circuits clearly foreshadow a particular ruling on the issue. *Ibid.* Although there need not be "a case directly on point," it must nonetheless be clear that "existing precedent [has] placed the . . . constitutional question beyond debate." *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (*per curiam*); *see also White v. Pauly*, 137 S. Ct. 548, 552 (2017) (*per curiam*) (denial of qualified immunity on excessive force claim was in error where court "failed to identify a case where an officer acting under similar circumstances . . . was held to have violated the Fourth Amendment," and instead relied on cases that "lay out excessive-force principles only at a general level").

Notwithstanding the generalized principle that Myles has substantive due process rights, there is no clearly established caselaw placing beyond debate the question of whether the denial of water to take a urine test constitutes a substantive due process violation. Indeed, other district court decisions upholding the constitutionality of prison officials' conduct in similar circumstances indicate the law to be—if anything—established in a direction unfavorable to Myles. *See Robles*, 2008 WL 4693153, at \*10; *see also Inman v. Hatton*, 2018 WL 1100959, at \*1-\*2, \*6-\*7 (N.D. Cal. 2018). Accordingly, qualified immunity shields defendants from any substantive due process claim that Myles has leveled against them.

## CONCLUSION

For the foregoing reasons, Myles's complaint is DISMISSED without prejudice. The motion to appoint counsel (Doc. #3) is DENIED as moot. If there is a basis for relief that is not precluded by the law stated in this ruling, then Myles may file a motion to reopen along with an amended complaint within 30 days by **August 18, 2019,** that cures the factual deficiencies identified in this ruling and alleges facts sufficient to show that each defendant violated his constitutional rights. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 18th day of July 2019.

/s/*Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge